522

Víctor Marcial Burgos, demandante y apelado, *v.* José Tomé, Jeanne Ubiñas, Radiation Oncology Center, Inc., Sociedad Profesional Marcial, Tomé & Ubiñas Cancer Institute, Las Américas Radiation Oncology Center, S.E., demandados y apelantes.

*Número:* AC-96-30 *Resuelto:* 10 de diciembre de 1997

*Eugene F. Hestres* y *Joanna Bocanegra*, de *Bird Bird & Hestres*, abogados de los apelantes; *Héctor Meléndez Cano*, de *Trías & Meléndez*, abogado de los apelados.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

¿Puede un tribunal disolver una sociedad por una causa distinta a las pactadas por los contratantes y antes de cumplirse el período estipulado para su duración? De tener tal facultad, ¿bajo qué circunstancias podría ejercerla?

Por entender que una sociedad constituida por un término fijo de duración puede ser disuelta por un tribunal si media un motivo justo para ello, de conformidad con el derecho aplicable, revocamos la sentencia del Tribunal de Circuito de Apelaciones y devolvemos el caso al Tribunal de

Primera Instancia para que, previa vista, determine si el fin para el cual se creó la sociedad especial es distinto al expresado en el contrato de constitución y si se configura en este caso alguna de las causales aquí reconocidas como constitutivas de justo motivo. Debe determinarse si la actitud de discordia y desavenencias entre los socios son de tal carácter grave, irremediable y constante, que impiden el desarrollo de los fines específicos para los cuales se creó Las Américas Radiation Oncology Center, S.E.

## I

Allá para 1973, los Dres. en Medicina Víctor A. Marcial, José M. Tomé y Jeanne Ubiñas organizaron la corporación Radiation Oncology Center, Inc. con el propósito de dedicarla a crear unidades de radioterápia; contratar los servicios profesionales y técnicos; llevar a cabo investigaciones científicas, y facturar por los servicios prestados. En esencia, la corporación fue creada para proveer servicios administrativos de apoyo a la sociedad profesional bajo la que operaban de facto los mencionados galenos.

Cuatro (4) años más tarde formalizaron el acuerdo de brindar servicios de radiología y radioterapia en conjunto, constituyendo formalmente la Sociedad Profesional Marcial, Tomé & Ubiñas Cancer Institute, también conocida como el Instituto de Radioterapia Oncológica. Esta sociedad profesional se dedicaría a brindar sus servicios a la corporación mencionada. Ésta se constituyó por un período de tiempo indefinido.

Posteriormente, en 1988 formaron la sociedad especial Las Américas Radiation Oncology Center, S.E. para comprar, habilitar y administrar un inmueble en la Clínica Las Américas. Ésta se constituyó al amparo de las Secs. 330–335 de la•Ley de Contribuciones sobre Ingresos de 1954, según enmendada, 13 L.P.R.A. ants. secs.

3330–3355. En el contrato de sociedad acordaron que ésta tendría un término de duración de veinte (20) años. Esta sociedad adquirió una unidad en el mencionado condominio y la arrendó a la corporación. Desde dicho condominio, la sociedad profesional rendía sus servicios a la corporación. Los únicos ingresos de la sociedad especial se derivaban del referido arrendamiento. Marcial, Tomé y Ubiñas eran partícipes, en partes alícuotas de un tercio, en las tres (3) entidades jurídicas a través de las cuales ejercían su profesión como médicos especialistas en radioterapia.

Tras años dedicados al ejercicio de sus respectivas funciones en un clima de armonía y concordia, hacia principios de la década de los noventa las relaciones entre los médicos comenzaron a deteriorarse. Tal deterioro se produjo principalmente por diferencias relativas a la administración de la sociedad profesional y de la corporación. Una de las principales razones se relacionaba con el empleo de la Dra. Luisa V. Marcial Vega, hija del doctor Marcial, por parte de la sociedad, y el ofrecimiento que alegadamente se le hiciera a ésta de una participación en la sociedad profesional y en la corporación. Esta disputa fue objeto de una acción judicial separada, incoada en 1992 por la Dra. Luisa Marcial. Véase el Caso Núm. DDP-92-3017, que fue presentado en el Tribunal Superior de Bayamón.

Luego de que surgieran los problemas, en repetidas ocasiones el Dr. Víctor Marcial le manifestó a sus socios su disposición para comprarle sus participaciones o venderles la suya. En la alternativa, les propuso proceder a la disolución voluntaria de las entidades. Tras la formulación de varias ofertas de compra y venta y de disolución que no fueron aceptadas por los doctores demandados, y en vista de la continua y prolongada situación, en mayo de 1993 Marcial interpuso una demanda ante el entonces Tribunal

Superior, Sala de San Juan, para la solución ordenada de las controversias corporativas y sociales.

En la demanda alegó la existencia de discrepancias irreconciliables con sus socios, las cuales dificultaban seriamente la marcha de las referidas entidades y enumeró una serie de situaciones críticas surgidas con sus socios. Propuso que se les fijara a las partes un término para negociar entre sí la compra o venta de sus respectivas participaciones y que, de no lograrse acuerdo, se les solicitara un plan para la disolución voluntaria de las entidades. En última instancia pidió que se convirtiera la acción en una de disolución involuntaria de las tres (3) entidades en las que mantiene intereses propietarios con los doctores Tomé y Ubiñas.

En marzo de 1994, el tribunal de instancia emitió una sentencia parcial en la que impartió su aprobación a una estipulación de las partes para que se decretase la disolución de la corporación. Tras dictaminar que la solicitud de disolución presentada en el tribunal cumplía con los requisitos de notificación de la declaración de voluntad para disolver la corporación, que estaban dispuestos en el Certificado de Incorporación, ordenó la disolución de la corporación Radiation Oncology Center, Inc., que habría de ser efectiva el 22 de marzo de 1994. Dispuso, además, que los trámites de la liquidación debían concluir en o antes de seis (6) meses de emitida la sentencia y que durante ella toda determinación debía ser suscrita por los tres (3) accionistas.

Dicha sentencia fue incumplida por las partes. En vista de ello, siete (7) meses después de emitida, el Tribunal Superior emitió una resolución y orden en la que ordenó a la corporación que continuara facturando los servicios profesionales que prestaran los médicos del Instituto de Radioterapia hasta tanto el tribunal designara un síndico liquidador. En diciembre de 1995 todavía no se había nombrado a dicho síndico liquidador. Véase el Alegato de Ré-

plica al Tribunal de Circuito de Apelaciones, Alegato del Apelante, Apéndice, págs. 647–648.

Luego de varios trámites procesales, el foro de instancia emitió una segunda sentencia parcial sin celebrar una vista evidenciaria. En ella resolvió que como el contrato de sociedad profesional disponía una disolución por voluntad de cualquiera de los socios y establecía un procedimiento para ello,[1] el doctor Marcial debía proceder conforme a lo allí estipulado. En lo referente a la sociedad especial, determinó que no procedía su disolución por no haber expirado aún el término dispuesto para su terminación y porque no se daban, además, las condiciones dispuestas en el contrato de sociedad para su disolución.

De conformidad con las disposiciones del contrato de sociedad especial, el tribunal a quo estimó que el demandante tenía disponibles varias alternativas: vender, ceder o traspasar su interés en la sociedad a los demandados, o esperar a que la sociedad dejase de existir conforme a sus propios términos. Por ello, ordenó el archivo de la demanda en cuanto a la sociedad especial. Contrario a lo que había hecho previamente,[2] el tribunal no hizo mención sobre si se daba o no en este caso el "justo motivo" que disponía el Art. 1598 del Código Civil, 31 L.P.R.A. sec. 4398, para ordenar la disolución de una sociedad establecida por un período determinado.

Posteriormente, en reconsideración, en lo referente a la sociedad profesional el Tribunal Superior determinó que

---

[1] El Art. 20 del contrato de sociedad profesional disponía una disolución voluntaria y sólo requería que se notificara por escrito una solicitud a tales efectos a los demás socios con no menos de treinta (30) días de anticipación.

[2] En su Resolución de 23 de enero de 1995, al declarar sin lugar las mociones de desestimación y de sentencia sumaria, dicho foro trajo a la atención de las partes que el derecho vigente le permitía declarar disuelta una sociedad aunque no se dieran las causales expuestas en el Código Civil ni las voluntarias y expresamente pactadas en el contrato de sociedad. En dicha resolución mencionó que en el caso de marras existía una controversia de hecho en cuanto a si existía o no justa causa para disolver, por lo que consideró necesario que se le demostrara al tribunal que el motivo para dar por terminada la sociedad no se debía a un mero capricho del socio o a que éste hubiera antepuesto su interés personal al social.

las manifestaciones del demandante en su solicitud de reconsideración constituían una declaración de su voluntad de solicitar la disolución de esta entidad, por lo que estimó que había empezado a transcurrir el término establecido en el Art. 20 del contrato de sociedad profesional para que la disolución fuese efectiva. En esa reconsideración dicho foro denegó de nuevo la solicitud de disolución involuntaria de la sociedad especial.

Inconforme con esta decisión, el doctor Marcial apeló al Tribunal de Circuito de Apelaciones y señaló que en su caso existía base adecuada para disolver la sociedad especial. Argumentó que las causales para la disolución de una sociedad no se limitaban a las expuestas en el contrato de sociedad sino que, en vista de que la enumeración de causales para la disolución de sociedades en el Código Civil era de orden enunciativo, en nuestro ordenamiento había cabida para reconocer la causal de disolución por motivo del rompimiento de la armonía social. Señaló, además, que los doctores demandados seguían operando la corporación como si ésta no hubiese sido disuelta, sin existir base en derecho para ello ni para que se les imputaran obligaciones contraídas de forma *ultra vires.*

Por su parte, los médicos apelados alegaron que la sociedad especial debía subsistir por entender que la solicitud del doctor Marcial estaba revestida de mala fe, según dispuesta en el Art. 1597 del Código Civil, 31 L.P.R.A. sec. 4397. En este tipo de casos la mala fe está inspirada en el deseo de uno de los socios de disolver el consorcio con la intención de apropiarse para sí del haber común. Señalaron, además, que el "justo motivo" que disponía el Art. 1598 del Código Civil, *supra*, para decretar la disolución de una sociedad que ha sido constituida por un tiempo determinado no es sinónimo del mero capricho de uno de los socios y que el motivo aducido tiene que relacionarse con asuntos de la sociedad que se pretende disolver. Al respecto adujeron que en el caso de marras las causas de fricción

entre las partes están relacionadas con el manejo de los asuntos de la corporación y de la sociedad profesional, y que como la sociedad especial es una entidad separada y distinta de las otras dos (2), dichas diferencias no podían dar pie a su disolución. También señalaron que el contrato de constitución de una sociedad especial provee un mecanismo adecuado para la administración de los asuntos sociales y la solución de disputas, mediante el voto de la mayoría de los socios, por lo que no hay peligro de que se forme un *impasse* y no se requiere la intervención del tribunal.

El Tribunal de Circuito de Apelaciones revocó y ordenó la designación de un síndico liquidador que en el término de treinta (30) días procediera con la liquidación de la totalidad de los negocios entre las partes. Dicho foro concluyó que aunque en el caso de autos no está presente ninguna de las condiciones pactadas por los socios en el contrato para la disolución de la sociedad especial, existe justa causa para decretar la disolución a tenor con el Art. 1598 del Código Civil, *supra.* A su juicio, la amplia gama de animosidades y desavenencias demostraba que estos médicos no podían continuar vinculados en sociedad, pues ello iría contra los fines mismos de este tipo de contrato. Entendió, además, que la sociedad especial no cumplía ya con los fines para los que se creó, los cuales estimó que consistían en comprar y habilitar un espacio en la Clínica Las Américas y arrendarlo a la corporación para que desde allí pudiera operar la sociedad profesional. También determinó que no había mala fe por parte de Marcial al solicitar la disolución de las entidades.

Inconformes, los doctores demandados, Tomé y Ubiñas, recurren ante nos. Señalan que erró el Tribunal Circuito de Apelaciones: (1) al determinar, como cuestión de hecho, que la sociedad tenía como fin exclusivo comprar y habilitar un inmueble y arrendarlo a la corporación para que desde allí pudiera operar la sociedad profesional, y a base

de dicha determinación concluir que a tenor con el Art. 1591 del Código Civil, 31 L.P.R.A. sec. 4391, procedía decretar su disolución por no cumplir ya ésta con los fines para los cuales se creó; (2) al concluir que la amplia gama de desavenencias y animosidades existentes entre los socios constituyen la justa causa para la disolución de la sociedad especial, de conformidad con el Art. 1598 del Código Civil, *supra*; (3) al determinar que la solicitud del apelado para que se disuelva la sociedad especial no está revestida de mala fe, y (4) al ordenar la liquidación "de la totalidad de los negocios entre las partes", considerando de esta forma asuntos que no le fueron planteados e invadiendo así la competencia del Tribunal de Primera Instancia, ante el cual se estaba considerando la liquidación de las dos (2) entidades previamente disueltas.

Como vemos, surge de todo lo anterior que dos (2) de las tres (3) entidades en las que los doctores Marcial, Tomé y Ubiñas mantenían intereses propietarios en común —la corporación y la sociedad profesional— fueron disueltas. Sin embargo, aparentemente sus respectivas liquidaciones aún están pendientes.

Aunque se nos señalan varios errores, el que consideramos central para la disposición final del caso es el siguiente: ¿Puede un tribunal disolver una sociedad por una causa distinta a las pactadas por los contratantes y antes de cumplirse el período estipulado para su duración?

Antes de adentrarnos en su análisis, es menester que examinemos brevemente el primer señalamiento de error en torno a la determinación fáctica que hiciera el Tribunal de Circuito de Apelaciones sobre el propósito por el cual se creó la sociedad especial. Es necesario, además, que determinemos luego si hubo mala fe por parte del doctor Marcial al solicitar la disolución de la sociedad especial, para atender de esta forma el tercer error planteado ante nos. Decidir estas dos (2) cuestiones previamente es necesario para

de ahí partir al derecho aplicable a la disolución de una sociedad.

## II

En su sentencia, el Tribunal de Circuito de Apelaciones determinó que la sociedad especial se había creado "exclusivamente para comprar y habilitar un espacio en el Edificio Clínica Las Américas y arrendarlo a la corporación para que pudiera operar desde allí la sociedad profesional". Sentencia apelada de 9 de febrero de 1996, pág. 8. A base de dicha determinación de hecho y en vista de que tanto la corporación como la sociedad profesional habían sido disueltas, ese tribunal concluyó que la sociedad especial no cumplía ya con los fines para los cuales se había creado, por lo que conforme al Art. 1591 del Código Civil, *supra*, procedía su disolución.

Al así decidir, el Tribunal de Circuito de Apelaciones revocó la determinación del tribunal de instancia de que no procedía la disolución de la sociedad especial y que debían las partes atenerse a lo dispuesto en el contrato de sociedad. El tribunal a quo siguió una regla de interpretación formalista al concluir que la manifestación exterior de la voluntad de los contratantes correspondía con lo querido por éstos.

El contrato de sociedad especial dispone en específico en su cláusula 6 que la sociedad se constituía para: "acquire[,] hold, own, mortgage, exchange, operate, improve, lease, sell and otherwise manage the real property described in Exhibit I [("office #109, Clínica Las Américas, a building which will house medical office facilities with a projected area of 7,950 square feet with annex parking spaces available")]". Anejo III, pág. 4. Durante los trámites en instancia, el doctor demandante planteó que la sociedad especial se había creado para un propósito específico distinto al

detallado en su contrato de constitución. En específico, el doctor Marcial detalló en su moción en oposición a la desestimación y en solicitud de sentencia sumaria lo siguiente:

> La sociedad especial fue creada para comprar y habilitar un espacio idóneo para las operaciones de Radiation Oncology Center ("la Corporación"), poseída por los mismos tres doctores que constituyen la Sociedad Especial. Dado el hecho de que en el ejercicio de su profesión los doctores concernidos utilizan materiales radioactivos, la habilitación del local exigió reformas para ofrecer la protección que la ley exige y tiene características singulares. Apéndice de la Oposición a la moción de desestimación, págs. 301–302.

■ Como se sabe, cuando los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, el Código Civil señala que "se estará al sentido literal de sus cláusulas". Art. 1233 (31 L.P.R.A. sec. 3471). Aunque —de ordinario— al adjudicar controversias dentro del ámbito contractual, este Tribunal presupone que lo consignado expresamente en el texto contractual consiste en la voluntad de las partes contratantes, en circunstancias en que ha tenido dudas sobre la intención común y evidenciada de los contratantes no ha vacilado en indagar más a fondo sobre cuál ha sido la verdadera intención de las partes, sobre todo en casos que han sido adjudicados vía el mecanismo de sentencia sumaria. *Sucn. Ramírez v. Tribl. Superior*, 81 D.P.R. 357 (1959) (en reconsideración). Véase la opinión disidente del Juez Asociado Señor Serrano Geyls en *Torrech v. Ramos*, 84 D.P.R. 258 (1961).

■ No se trata aquí del tipo de situación extraordinaria en que se esté interviniendo con la autonomía contractual mediante el ejercicio de la función moderadora del tribunal; función que, según hemos expresado, debe ejercerse "con extrema cautela y patente justificación". *López de Victoria v. Rodríguez*, 113 D.P.R. 265, 271 (1982). Así tampoco se trata de ir contra la doctrina de la irrevocabilidad de los

contratos, que tanto efecto nocivo proveen en la seguridad jurídica y en la estabilidad de los contratos.

Como se sabe la tendencia de los tribunales es a limitar la interpretación a los casos en que se haga verdaderamente necesaria. Interpretar si un contrato es claro presupone concordar su letra con la intención de las partes. En relación al proceso de análisis que habrá de seguirse en esos casos, coincidimos con el Tribunal Supremo español cuando éste señala que:

> ...[S]i bien el primer elemento interpretativo es el gramatical, éste presupone la interpretación, dado que el afirmar que una cláusula es clara, implica una valoración de las palabras y de la congruencia que con la voluntad guardan, por lo que la claridad, más que en los términos del contrato, ha de estar y resaltar en la intención de los contratantes .... S. de 9 de diciembre de 1965, Núm. 5603, XXXII (Vol. II) Repertorio de Jurisprudencia 3433.

■ En nuestra jurisdicción rige la teoría de la subjetividad en la interpretación de los contratos, teoría que entraña el indagar cuál fue la voluntad real de las partes con el propósito de que ésta prevalezca. *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991); *Ramírez, Segal & Látimer v. Rojo Rigual*, 123 D.P.R. 161, 173 (1989). Aunque en la interpretación de los contratos deba partirse de la expresión contenida en sus palabras, el juzgador no puede detenerse en su sentido literal, sino que debe indagar fundamentalmente la intención de las partes y el espíritu y la finalidad que hayan perseguido éstas con el negocio, infiriéndose de la total conducta de los interesados y de las circunstancias concurrentes que puedan contribuir a la acertada investigación de la voluntad de los otorgantes. *Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405, 417 (1978). Véanse: *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 69–70 (1983); *Merle v. West Bend Co.*, 97 D.P.R. 403, 409–410 (1969).

■ Para juzgar la intención de los contratantes debe-

rán examinarse todas las circunstancias indicativas de la voluntad de las partes. Deben atenderse principalmente a los actos de los contratantes anteriores, coetáneos y posteriores al otorgamiento del contrato. Art. 1234 del Código Civil, 31 L.P.R.A. sec. 3472. Anteriormente hemos expresado que es necesario tomar en consideración, además, la ocasión, las circunstancias, las personas y el acuerdo que se intentó llevar a cabo. *Ramírez, Segal & Látimer v. Rojo Rigual*, supra, pág. 174.

Comenta Puig Brutau en relación con los Arts. 1281 y 1282 del Código Civil español, análogos a los Arts. 1233 y 1234 de nuestro Código, 31 L.P.R.A. secs. 3471 y 3472, que, a su juicio

> ... el carácter indudable de las palabras empleadas [en un contrato] sólo resulta a consecuencia de haber sido confrontadas con cuantos elementos de valoración sean ofrecidos al juzgador. Sólo si la literalidad de las expresiones usadas no queda desvirtuada, se estará en el caso de aplicar el primer párrafo del artículo 1281 [nuestro Art. 1233]. El juzgador ha de examinar todas las circunstancias concurrentes aunque parezca que las partes se han expresado en términos claros. La estimación de que efectivamente lo son estará plenamente fundada después de dicho examen. (Escolio omitido.) J. Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. 1, pág. 232.

Un sector amplio de la doctrina coincide con esta interpretación de que en materia de interpretación contractual deben prevalecer las normas de interpretación subjetivas sobre las de interpretación objetiva. Ángel M. López López en M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, 2da ed., Madrid, Ed. Edersa, 1995, T. XVII, Vol. 2, págs. 32–43; Q.M. Scaevola, *Código Civil comentado y concordado*, 2da ed., Madrid, Ed. Reus, 1958, T. XX, pág. 879; L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 6ta ed. Madrid, Ed. Tecnos, 1989, Vol. II, págs. 83–86; J. Castán Tobeñas, *Derecho Civil español, común y foral*, 15ta ed., Madrid, Ed. Reus, 1988, T. 3, pág. 584. *Cf.* J.M. Manresa y Navarro, *Comentarios al Código Civil español*, 6ta

ed. rev., Madrid, Ed. Reus, 1967, T. VIII, Vol. 2, págs. 686–688.

 Podemos encontrarnos también ante un contrato cuyos términos a pesar de ser claros, por reflejar la común intención de las partes, y además no ser ambiguos, dudosos ni obscuros, sean demasiado generales. Para ese tipo de contrato dispone el Art. 1235 del Código Civil que cualquiera que sea la generalidad de sus términos, no deberán comprenderse en él cosas distintas y casos diferentes a los que las partes se propusieron e interesaron contratar. 31 L.P.R.A. sec. 3473. El supuesto para la aplicación de este articulado precisa ser que la generalidad de los términos contractuales sobrepasen abiertamente el propósito de las partes. En ese caso, lo que procede es reducir los términos para que respondan exclusivamente al propósito de las partes. S. del Tribunal Supremo español de 28 de junio de 1978, citada por Albaladejo, *op. cit.*, pág. 45 esc. 4, y por Díez-Picazo, *op. cit.*, pág. 85. Si la intención que quedó plasmada en el contrato es compatible con la intención evidente, mas esta última resulta ser mucho más específica que la expresada en el contrato, somos del criterio que debería prevalecer la verdadera intención que se tuvo al contratar. En este sentido, se recurriría a la norma general recogida en el Art. 1233 del Código Civil, *supra*, en conexión con el Art. 1234, *supra*, para indagar la intención real.

Aunque a primera vista el contrato del caso de marras parece ser claro, debido a los términos tan generales de sus disposiciones y a que de los autos no se desprende que el condominio en cuestión haya sido utilizado para otro propósito que no fuera el arrendársele a la corporación, albergamos serias dudas con respecto a si la verdadera intención de las partes consistió en adquirir un inmueble para arrendárselo a terceros.

Por la forma en que se preparó, desarrolló y administró el condominio sito en la Clínica Las Américas desde su

adquisición hasta el presente, podría concluirse razonablemente que la sociedad especial fue constituida para facilitar una de las distintas fases operativas necesarias para correr la empresa: brindar servicios de radiología y tratamientos de radioterapia a pacientes de cáncer. Recordemos que la sociedad especial adquirió el mencionado inmueble, lo arrendó a la corporación, la cual a su vez contrató los servicios de la sociedad profesional.

Estas actuaciones nos arrojan duda sobre si el fin particular de la sociedad especial fue el que quedó plasmado en el contrato social. La duda surge particularmente por el hecho de que con posterioridad al otorgamiento del contrato, la sociedad especial hizo prácticamente una exclusiva y específica función; la cual, aunque no se aparta de lo plasmado en el contrato de sociedad, tiene tal especificidad que podría razonablemente pensarse que —distinto a lo genéricamente plasmado en el contrato— la voluntad específica de los contratantes era otra.

Estas dudas nos impiden resolver dicha cuestión sin dar a las partes la oportunidad de ofrecer prueba en el juicio correspondiente. Estimamos que existe una controversia genuina sobre hechos materiales a la interpretación de la cláusula contractual sobre el propósito o la intención con que fue creada la sociedad especial.

Sin embargo, sin que hubiera desfilado prueba en instancia al respecto, el tribunal a quo resolvió la controversia a base de los documentos que tuvo ante sí. Conforme a los términos del contrato concluyó que no fue la intención de las partes que la vida de la sociedad especial estuviera atada a la de las demás entidades, sino que, por el contrario, mantuviese su personalidad y vida independiente. Además, estimó que como del contrato se desprende que el propósito de la sociedad fue comprar y administrar un condominio, éste podía ser utilizado para ofrecer otros servicios médicos, sin que se limitara su uso a la radiología.

Por su parte, al determinar que la sociedad especial se había creado con un propósito particular y concluir que, tras la disolución de las otras dos (2) entidades, la sociedad podía disolverse por no cumplir ya con los fines para los cuales se había creado, el Tribunal de Circuito de Apelaciones se alejó de lo que dispone el contrato de socieoad especial sin hallar apoyo en los documentos que obran en autos, y sin contar con testimonios u otra evidencia extrínseca por no haberse celebrado vista alguna en instancia. Ante la duda sobre un hecho tan esencial, dicho foro debió haber revocado y devuelto para que desfilara prueba sobre cuál fue la intención real de los socios al constituir la sociedad especial Las Américas Oncology Center, S.E., si es que ésta difiere de lo establecido en el contrato.

Debido a que a la luz de las circunstancias particulares del caso ante nos no podemos llegar a una conclusión final sobre la interpretación de la referida cláusula, puesto que no contamos con todos los elementos de juicio necesarios, devolvemos el caso al Tribunal de Primera Instancia para el desfile de la prueba tendente a aclarar cuál fue la intención particular de los socios Marcial, Tomé y Ubiñas al constituir la sociedad especial Las Américas Radiation Oncology Center, S.E.

Si las circunstancias, actuaciones y conducta de los contratantes previas, coetáneas y posteriores a la constitución de la sociedad demuestran inequívocamente que su intención común al contratar fue distinta a la descrita en el contrato social, habría que determinar entonces si el propósito por el cual realmente se creó la sociedad ha quedado frustrado o si el negocio que realmente le sirve de objeto ha terminado. De ser ese el caso, procedería la disolución de la entidad social de conformidad con el Art. 1591 del Código Civil, *supra*.

## III

Los apelantes plantean en su tercer señalamiento de error que el Tribunal de Circuito de Apelaciones erró al determinar que la solicitud del apelado para disolver la sociedad especial no está revestida de mala fe, contrario surgía de los documentos sometidos ante dicho foro.

■ La buena fe es un principio general del derecho que permea todo nuestro ordenamiento jurídico y que goza de firme arraigo. Véanse, entre otros: *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339 (1989); *Catalytic Ind. Maint. Co. v. F.S.E.*, 121 D.P.R. 98 (1988); *H.U.C.E. de Ame. v. V & E Eng. Const.*, 115 D.P.R. 711 (1984); *Velilla v. Pueblo Supermarkets, Inc.*, 111 D.P.R. 585 (1981). La ley exige de los contratantes el respeto mutuo de la buena fe, tanto al momento de la formación del vínculo, durante el desarrollo de la relación y en la ejecución de la obligación. M.J. Godreau Robles, *Lealtad y Buena Fe Contractual*, 58 Rev. Jur. U.P.R. 367, 415 esc. 125 (1989), citando a Betty. Nos señala el profesor que lo que "constituye una actuación *bonafides* en concreto, o cuándo diremos que se ha violado la buena fe, en cada relación contractual ... es algo que sólo en algunas instancias encontraremos ya descrito, y quizás prescrito por una norma específica, pero en otras no podrá hallarse preceptuado". Godreau, *supra*, págs. 416–417.

■ En el contexto de la disolución por voluntad de un socio de un contrato de sociedad para la cual no se ha señalado un término para su duración, se entiende que hay mala fe cuando el deseo de uno de los socios de disolver el consorcio está inspirado en la intención de apropiarse para sí solo el provecho que debía ser común. Arts. 1596 y 1597 del Código Civil, 31 L.P.R.A. sec. 4396 y 4397. Según surge del Art. 1597 del Código Civil, *supra*, se trata aquí de un estado psicológico que debe existir en el socio que solicita la disolución de la sociedad. Este estado psicológico consti-

tuye una de las maneras en que el Código Civil tipifica una actuación específica como violatoria de la buena fe. Al respecto, véase Godreau, *supra*, págs. 372–374.

No se trata éste de un caso en el que apliquen los Arts. 1596 y 1597 del Código Civil, *supra*, pues dichos preceptos se refieren a la disolución de una sociedad por voluntad o renuncia de uno de sus socios, y este tipo de disolución no tiene lugar en las sociedades con término fijo de duración, como la de autos. Además, debido a que la mala fe no se presume y a que no obra ante nos evidencia a base de la cual podamos concluir que existió mala fe por parte de Marcial al acudir a los tribunales a resolver las disputas existentes, tenemos que concluir, al igual que lo hizo el Tribunal de Circuito de Apelaciones, que ésta no está presente en el caso ante nuestra consideración.

De los autos no se desprende documento ni expresión alguna que nos indique que la intención del doctor Marcial al solicitar la disolución, como última alternativa, ha sido la de apropiarse para sí lo que debía ser común. Todo lo contrario, surge del expediente que dicho galeno acude a los tribunales para solucionar ordenadamente las controversias corporativas y sociales, porque a su juicio los demandados estaban tomando decisiones importantes para el funcionamiento de las empresas sin su consentimiento ni conocimiento, las cuales consideraba contrarias a las más elementales normas de sana administración. Marcial además siempre estuvo en la mejor disposición de vender o comprar las participaciones sociales. A tales efectos, realizó ofertas de venta de su participación social y de compra de la de sus socios en igualdad de condiciones, cuyos términos, en ausencia de evidencia en contrario, aparentan ser razonables.[3] Tomé y Ubiñas entorpecieron y alargaron in-

---

[3] En esencia el demandante Marcial le propuso a sus socios transferirles su participación a cambio de que lo liberaran incondicionalmente de toda deuda de las entidades. Véase Apéndice del Alegato de los apelantes, págs. 147–148.

justificadamente las negociaciones e impusieron, además, condiciones irrazonables a esas ofertas.(⁴)

Tras determinar que no se desprende del expediente la alegada mala fe por parte del doctor Marcial, pasemos propiamente a evaluar si, conforme con el ordenamiento vigente, procede o no disolver la sociedad especial Las Américas Radiation Oncology Center, S.E., en la que las partes comparten intereses propietarios en partes iguales. Para ello describiremos primeramente la figura jurídica ante la cual nos encontramos. Discutiremos en segundo lugar en qué consiste una disolución y cuál es el derecho aplicable a las disoluciones del tipo de entidades jurídicas ante nos.

## IV

A. La sociedad especial es una modalidad de sociedad civil incorporada a nuestro ordenamiento jurídico hace poco más de diez (10) años, con el propósito de incentivar el desarrollo de ciertas actividades económicas. Véanse: Ley Núm. 8 de 19 de julio de 1985 (13 L.P.R.A. ants. secs. 3330–3355 y 3411) (en adelante Ley Núm. 8); L.M. Negrón Portillo y M.M. Fabián Maldonado, *Derecho Mercantil y otros principios generales del derecho puertorriqueño*, San Juan, [s. ed.], 1977, pág. 218. Debido a que en Puerto Rico las sociedades eran tratadas contributivamente como un ente separado de los miembros que la componían, en 1985 la Asamblea Legislativa creó este mecanismo que no tributaría como un ente separado, solamente se tributaría a sus socios en su carácter individual.(⁵)

---

(⁴) Los socios contestaron a la oferta realizada por Marcial que imponía condiciones tales como que Marcial no estableciera práctica alguna en conflicto con la de ellos y requiría que se desistiese el pleito de la doctora Marcial contra ellos. Apéndice del Alegato de los apelantes, págs. 149–154.

(⁵) La Ley Núm. 8 de 19 de julio de 1985 (13 L.P.R.A. ants. secs. 3330–3355 y 3411) (en adelante Ley Núm. 8) añadió el Suplemento P a las disposiciones suplementarias de la Ley de Contribuciones sobre Ingresos de 1954 para establecer el método de tributación que le aplicaría a las sociedades que optaran por operar como sociedades especiales.

Véase la Ley Núm. 8, *supra*. Cualquier sociedad que cumpliera con los requisitos establecidos en la ley de contribuciones podía optar por operar como una sociedad especial.([6])

Para propósitos del ordenamiento civil, ésta sería considerada como una sociedad de responsabilidad limitada. Así se desprende de la enmienda realizada al Art. 1589 del Código Civil tras la aprobación de la Ley Núm. 8, *supra*, al disponer que en caso de que el patrimonio social no alcance para cubrir las deudas y obligaciones de la sociedad, sus socios responderían limitadamente hasta el monto de su aportación. 31 L.P.R.A. sec. 4372. Véase la Exposición de Motivos de la Ley Núm. 3 de 27 de septiembre de 1985, Leyes de Puerto Rico, pág. 892.

Las normas que reglamentan la sociedad especial, como vemos, se desprenden del Código de Rentas Internas,([7]) en lo que a su carácter fiscal se refiere, y del Código Civil, en sus aspectos sustantivos. En cuanto a este último, la socie-

---

Con la aprobación del Código de Rentas Internas de 1994, las disposiciones relacionadas a las sociedades especiales fueron relocalizadas, con ciertas enmiendas, en el Subcapítulo K de Sociedades Especiales y Socios, 13 L.P.R.A. secs. 8630–8658.

([6]) En particular, se dispuso que una sociedad sería elegible para operar como sociedad especial si al menos el setenta (70) por ciento de su ingreso bruto anual provenía de fuentes de Puerto Rico y, por lo menos, el setenta (70) por ciento de dicho ingreso era producto de la explotación de ciertas actividades allí enumeradas, entre las cuales se incluyó un negocio de venta o arrendamiento de edificaciones o estructuras. Ley Núm. 8, *supra*. Con dichas enmiendas se pretendió facilitar y promover la explotación de determinadas actividades.

([7]) La propia Ley de Contribuciones sobre Ingresos definió el término "sociedad especial" como que "incluye a dos o más personas que se dediquen conjuntamente a cualquiera de las actividades enumeradas en la [Sección 330 de esta ley] y que hayan optado por acogerse a las disposiciones de[l Suplemento P del Capítulo 3 de la misma]". Art. 3 de la Ley Núm. 8 de 1985 (13 L.P.R.A. sec. 3411 (Supl. 1992)). Dispuso, además, que ella se considerará existente hasta tanto sea terminada, y se considerará terminada sólo si:

"(1) Se solicita la revocación de la opción para operar como sociedad, o se revoca la opción a instancias del Secretario de Hacienda, según se dispone en la [Sección 340(b) de esta ley].

"(2) Se incumple con cualquiera de los requisitos señalados en la Sección 330.

"(3) Los socios acuerdan terminar con la existencia de la sociedad especial por una razón comercial válida, previa notificación y aprobación del Secretario. La terminación será efectiva desde la fecha de la notificación." Art. 1 de la Ley Núm. 8, *supra*, 13 L.P.R.A. sec. 3339(a) (Supl. 1992).

dad especial se regirá, en primera instancia, por lo pactado en el contrato de sociedad y, de manera supletoria, por el ordenamiento civil.

En materia de contratos, como regla general, las disposiciones del Código Civil rigen sólo en ausencia de pacto o convenio expreso entre los socios. A tenor con nuestro Art. 1556 del Código Civil, la sociedad es un contrato por el cual dos (2) o más personas se obligan a poner en común dinero, bienes o industria, con ánimo de partir entre sí las ganancias. 31 L.P.R.A. sec. 4311.

■ La sociedad es el producto de la convención, por lo que, para existir, requiere la existencia de un contrato. *Daubón Belaval v. Srio. de Hacienda*, 106 D.P.R. 400, 412 (1977), citando a Manresa y Navarro, *op. cit.*, pág. 375. El contrato de sociedad se caracteriza por ser: preparatorio, porque crea una entidad destinada a celebrar otros contratos; consensual, porque se perfecciona por el mero consentimiento; bilateral o plurilateral, porque da nacimiento a derechos y obligaciones recíprocas; oneroso, porque entre las prestaciones de los socios y las ganancias que esperan hay equivalencia; de confianza, por contraerse en atención a las cualidades personales de los socios (*intuitus personae*). J.R. Vélez Torres, *Curso de Derecho Civil*, San Juan, Ed. Rev. Jurídica U.I.A., 1990, T. IV, Vol. II, pág. 388; Puig Brutau, *op. cit.*, 2da ed., T. II, Vol. 2, pág. 486; Demófilo De Buen, Sociedad, en *Enciclopedia Jurídica Española*, Barcelona, Ed. F. Seix, 1910, T. 28, pág. 862. Esta última característica se considera como una fundamental a este tipo de contrato.

■ Se trata éste de un contrato especial que se distingue además por la *affectio societatis*, la cooperación o empresa común hacia un mismo fin, propiciando la unión de intereses de diversas personas para fines de lucro. *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 188 (1985); *Tes. v. Tribl. Contribuciones y Fraticelli, etc.*, 70 D.P.R. 475, 478 (1949). Es esencial en este tipo de contrato

la intención de obtener ventajas patrimoniales. Véase V.M. Garrido Palma, *Hacia un nuevo enfoque de la sociedad civil*, 1972 Rev. Der. Privado 759, 769.

Conforme estima Garrido Palma, *supra*, pág. 773

...[e]xiste [sociedad civil] siempre que dos o más personas convienen en poner en común sus esfuerzos y actividad, plasmados en bienes, industria o servicios, para el común ejercicio de una actividad económica, patrimonial, ya sea con el ánimo o fin de obtener un resultado económicamente beneficioso para los socios como resultado de la colaboración común, ya con el fin de repartirse las ganancias obtenidas especulando con terceros, siempre que en este último caso la sociedad no sea calificable de mercantil, y en cualquier caso aparezca o no el vínculo social existente, ante los terceros. (Énfasis suprimido.)

La disolución de esta entidad jurídica significa la detención del desarrollo de las actividades sociales y el comienzo de su extinción.[8] Véase *Paz Vda. de Barletta v. Registrador*, 43 D.P.R. 870, 872 (1932). Ella tiene el efecto de producir la liquidación de la sociedad. En lo referente a la extinción y disolución de las sociedades, el Art. 1571 del Código Civil, 31 L.P.R.A. sec. 4342, dispone que la sociedad dura por el tiempo convenido y que se extingue:

(1) Cuando expira el término por que fue constituida.

(2) Cuando se pierde la cosa, o se termina el negocio que le sirve de objeto.

(3) Por la muerte natural, interdicción civil o insolvencia de cualquiera de los socios, y en el caso previsto en [el art. 1590 de este Código].[9]

(4) Por la voluntad de cualquiera de los socios, con sujeción a lo dispuesto en l[os arts. 1596 y 1598 de este Código]. (31 L.P.R.A. sec. 4391).

---

[8] Según expresa F. Videla Escalada en su obra *Las Sociedades Civiles*, Buenos Aires, Ed. Abeledo-Perrot, 1962, pág. 311: "la sociedad disuelta deja de tener intervención activa en el campo de los negocios y no emprende ya nuevas operaciones para el cumplimiento de sus finalidades específicas."

[9] El Art. 1590 del Código Civil se refiere al derecho de los acreedores particulares de cada socio a pedir el embargo y remate de la parte del socio-deudor, sin perjuicio del derecho preferente de cobro de los acreedores de la sociedad. 31 L.P.R.A. sec. 4373.

■ En los casos en que no ha expirado el término por el cual fue constituida la sociedad, si se da alguna otra de las causales dispuestas en el citado articulado, la sociedad podría disolverse, sujeta, claro está, a las limitaciones que el propio artículo establece al referirnos a otros artículos.

Cuando el contrato social fija un término para la duración de la sociedad, ésta puede disolverse si terminara el negocio para el cual fue constituida, antes de vencer el plazo prefijado para su duración; además, por las causas dispuestas en el Art. 1591(3) del Código Civil, *supra*. Como puede apreciarse, estas causales de disolución se refieren a hechos ajenos a la voluntad de los socios. Respecto a la disolución de sociedades por voluntad de cualquier socio, hay que interpretar de manera integrada los Arts. 1591, 1596, 1597 y 1598 del Código Civil, *supra*.

■ A tenor con el inciso (4) del citado Art. 1591 del Código Civil, el desistimiento unilateral o la renuncia de cualquiera de los socios, aunque no sea admisible en otros géneros de contratos, es permisible en el de sociedad. Sin embargo, el propio Código Civil establece los casos en que no tendrá lugar la disolución por este motivo.([10]) Ello es necesario pues, tal como opina Castán, "esta regla sería muy expuesta a abusos y arbitrariedades si no fuera acompañada de oportunas limitaciones". Castán Tobeñas, *op. cit.*, 14ta ed., Vol. 4, pág. 627.

■ Como único puede disolverse una sociedad por la voluntad o renuncia de uno de sus socios es *cuando no se ha señalado término para su duración*, o éste no resulta de la naturaleza del negocio. Art. 1596 del Código Civil,

---

([10]) Se entiende que según este supuesto de separación de un socio a iniciativa del propio socio, lo que opera es una disolución parcial, pues ella se limita a provocar la salida de la sociedad del socio renunciante, permaneciendo la sociedad entre los restantes. Francisco Capilla Roncero, citado en M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Edersa, 1986, T. XXI, Vol. 1, pág. 605.

*supra.*([11]) Si una sociedad se somete a un plazo por convenio, de ordinario, los socios tendrán que atenerse a lo acordado. No puede uno de ellos, por su mera voluntad, pedir la disolución pues, tácita o expresamente, adquirió el compromiso de mantenerse en la sociedad por el plazo señalado y no debe quedar a su arbitrio faltar a él.

Sin embargo, el Código Civil dispone más adelante, a manera de excepción, la posibilidad de disolver una sociedad constituida por término fijo, a solicitud de un socio, siempre y cuando medie justa causa. A tales efectos el Art. 1598 del Código Civil, *supra*, estipula:

> No puede un socio reclamar la disolución de la sociedad que, ya sea por disposición del contrato, ya por la naturaleza del negocio, ha sido constituida por tiempo determinado, a no intervenir *justo motivo*, como el de faltar uno de los compañeros a sus obligaciones, el de inhabilitarse para los negocios sociales, u otro semejante, a juicio de los tribunales. (Énfasis suplido.) 31 L.P.R.A. sec. 4398.

Sólo cuando haya justo motivo en apoyo de su solicitud, podrá uno de los socios solicitar la disolución de la entidad social antes de expirar el plazo convenido. Ello es así, pues la regla que somete a los socios al plazo de duración convenido no puede ser inflexible. Puig Brutau, *op. cit.*, 2da ed., T. II, Vol. 2, pág. 518.

Ahora bien, esto no significa que el socio, que con su conducta ha sido determinante del motivo, pueda valerse de este articulado para instar la acción de disolución de la sociedad y prevalecer. Ello implicaría la concesión de una ventaja al que se comporte mal, además de avalar el

---

([11]) En dicho caso, cuando la duración de la sociedad es indeterminada, para que la renuncia surta efecto debe ser hecha de buena fe, en tiempo oportuno y debe, además, ponerse en conocimiento de los demás socios. 31 L.P.R.A. sec. 4396. Véase J.M. Manresa y Navarro, *Comentarios al Código Civil español*, 6ta ed. rev., Madrid, Ed. Reus, 1972, pág. 569. Según los propios términos del Art. 1597 del Código Civil, sería de mala fe la renuncia "cuando el que la hace se propone apropiarse para sí solo el provecho que debía ser común". 31 L.P.R.A. sec. 4397. En caso de mala fe, el renunciante no se libraría para con sus socios, quienes tendrían la facultad de excluirle de la sociedad. Íd.

incumplimiento de las obligaciones libremente contraídas. Scaevola, *op. cit.*, 2da ed., T. XXV, Vol. 2, pág. 194. Si el motivo que se aduce como justo es ajeno a su voluntad o, al menos, no imputable a culpa o dolo suyo, el justo motivo lo sería tanto para él como para los demás socios y podría valerse de la autorización legal. Íd. Véase Albaladejo, *op. cit.*, 1986, T. XXI, Vol. 1, págs. 692–693.

Respecto al justo motivo, Scaevola concurre con Battista en que éste "ha de ser apreciado con relación al contrato de sociedad a que se refiere, a algo que lo ataque en su esencia e impida o amenace los fines para los que la sociedad se ha formado, de tal manera que sea más aconsejable, desde el punto de vista del interés objetivo de los socios, disolverla". Scaevola, *op. cit.*, pág. 191. La doctrina concurre en que las causales que cita el Art. 1598 del Código Civil, previamente transcrito, como constitutivas de justo motivo, no parecen ser taxativas o exhaustivas. Díez-Picazo, *op. cit.*, pág. 534; Albaladejo, *op. cit.*, 1986, pág. 575.

El primer motivo que enumera dicho artículo (el de faltar un socio a sus obligaciones) está presente en todos los contratos que establezcan la facultad resolutoria. Es decir que, en aquéllos en que haya obligaciones recíprocas, cuando una de las partes incumple con su obligación, la otra puede optar por resolver el contrato. En el caso del contrato de sociedad, este motivo procederá cuando se trate de incumplimientos que dificulten o hagan imposible la consecución del fin común, por obstaculizar la marcha de las actividades sociales. Tales serían, por ejemplo, la falta de aportación de capital o de industria, o incumplir con lo que se estime básico para constituir la sociedad. Véanse: *Ayende v. Crespo*, 38 D.P.R. 141, 149 (1928); Scaevola, *op. cit.*, pág. 191; Albaladejo, *op. cit.*, 1986, pág. 687.

El incumplimiento de los deberes de administración podría considerarse también dentro de este primer motivo como base para la disolución de una sociedad. En ese sentido, habría que examinar primeramente lo pactado

con respecto a la administración de la sociedad, para entonces determinar si se trata de un incumplimiento de carácter grave y si existe alguna forma de impedirlo. Al respecto, véase Albaladejo, *op. cit.*, 1986, págs. 687–689. Otros incumplimientos que podrían invocarse como causal de disolución serían el incumplimiento del deber de fidelidad, si como consecuencia de ello se hace muy difícil el desarrollo normal de la marcha de la sociedad, y el incumplimiento de comunicar las ganancias y pérdidas, luego de realizarse las reclamaciones oportunas sin éxito y la situación sea reiterada y revista la trascendencia necesaria. Albaladejo, *op. cit.*, 1986, págs. 689–690.

El segundo motivo, el de que un socio se inhabilite para los negocios sociales, no sólo se refiere a la incapacitación jurídica, sino también a la que afecte la aptitud necesaria para el desenvolvimiento de los negocios sociales. Scaevola, *op. cit.*, pág. 192. Batlle ve el término inhabilitación en este artículo con un sentido muy amplio, que se refiere no sólo a la capacidad para realizar negocios jurídicos, sino también a la actitud precisa para el desenvolvimiento de los negocios sociales. Batlle, citado por J.L. Lacruz Berdejo, *Elementos de Derecho Civil*, Barcelona, Ed. Bosch, 1974, T. II, Vol. 3, 1979, pág. 279.

En este sentido cabe reconocer el rompimiento de la armonía y confianza, indispensables al concepto mismo de sociedad, dentro de una concepción general de "el inhabilitarse para los negocios sociales" como constitutivo del justo motivo para la disolución. Este principio tiene un largo historial. La legislación de Partida reconocía como justo motivo el carácter violento de un socio que hiciera por ello insoportable su compañía, la ausencia por causa de servicio público, la obtención de empleo o cargo que impida al socio continuar en la sociedad, y el quebrantamiento de las condiciones con que se obligó el renunciante. *Las Siete Partidas del Rey Don Alfonso*, Real Academia de la Historia,

Madrid, Ed. Atlas, 1972, Partida Quinta, Tit. XIV, Ley XIV. Véase Manresa y Navarro, *op. cit.*, T. II, pág. 570.

 En el ámbito de la legislación de corporaciones esta Curia ha resuelto que un tribunal tiene la facultad para ordenar la disolución involuntaria de una corporación cerrada y el nombramiento de un síndico liquidador, a pesar de reconocer que "un decreto de disolución y sindicatura es un remedio que debe ser utilizado en situaciones excepcionales". *Epstein v. F. & F. Mortgage Corp.*, 106 D.P.R. 211, 213 (1977).[12] Por voz del entonces Juez Asociado Señor Martín, este Tribunal expresó que cabía equiparar a la corporación cerrada con la sociedad en cuanto a las reglas que rigen su disolución. Íd., pág. 219. Ello, debido a que en ambas entidades se requiere un alto grado de confianza y colaboración, y que las discrepancias que puedan surgir entre sus dirigentes normalmente tienen un efecto detrimental en las operaciones del negocio. Íd. En esa ocasión este Tribunal señaló que "[f]orzar la continuidad de una corporación bajo esas circunstancias podría conllevar la pérdida de los activos y quizás la insolvencia de la corporación". Íd., pág. 220.

En cuanto a otros motivos que estima justos, Scaevola acude por analogía al Código de Comercio y menciona, entre otros, éstos que consideramos pertinentes al caso ante nos, la ingerencia en funciones administrativas por el socio no administrador, Art. 138 del Código de Comercio, 10 L.P.R.A. sec. 1451, lo cual, a su juicio, significa una infrac-

---

[12] Al respecto el Tribunal expresó:

"Toda vez que la Ley General de Corporaciones no prohíbe la disolución por la vía judicial de una corporación, a la luz de los hechos presentes en el caso de autos y a tenor con el espíritu de equidad del Art. 7 del Código Civil de Puerto Rico, resolvemos que el tribunal de instancia actuó correctamente al disolver las corporaciones demandadas. ... Es evidente que por razón de las discrepancias irreconciliables entre los únicos dos socios accionistas, la corporación estaba avocada a una crisis, cuyos resultados son fáciles de predecir. ... Es forzoso concluir que las circunstancias especiales presentes en este caso y la posibilidad de insolvencia constituían una amenaza constante que justificaba la disolución de la corporación y el nombramiento de un síndico liquidador." (Escolio omitido.) *Epstein v. F. & F. Mortgage Corp.*, 106 D.P.R. 211, 221 (1977).

ción de lo convenido, una intromisión perturbadora que implica situaciones de violencia en la sociedad. Scaevola, *op. cit.*, págs. 192–193. Esta causal encaja dentro del primer motivo previamente discutido. Menciona también el hecho de una situación de discordia o desavenencia entre los socios, entendiendo por tales aquellas que sean graves y de carácter constante, no pasajero, por ir éstas contra el *ius fraterniatis* tan característico de la sociedad. Íd. Como vemos, esta causal puede catalogarse dentro de la inhabilitación para los negocios sociales, segundo motivo que menciona el Código de Comercio y que ya hemos discutido.

Como vimos, la sociedad se caracteriza por la confianza existente entre los socios que la componen, pues en virtud de ésta es que se forma mayormente la entidad. Nos dice Capilla Roncero en la obra de Albaladejo que la relación social es una relación de confianza y en atención a las condiciones personales de los socios, "que se manifiesta poco apta para perdurar cuando sobreviven alteraciones sustanciales que afectan a las personas de los socios o sus aptitudes". Albaladejo, *op. cit.*, pág. 610.

En contraposición con lo anterior, tenemos el principio político y social sobre el cual se fundamenta la institución social: el principio de conservación de la empresa. Este principio es común a todo tipo de sociedad, aunque se manifiesta con más fuerza en las sociedades mercantiles.[13]

Conforme a éste se atiende a la función de la empresa social, no sólo para el socio o empresario, sino también hacia los innumerables intereses que se vinculan a ella. Este principio vincula a la empresa con el progreso y bienestar

---

[13] Al respecto, véanse: Albaladejo, *op. cit.*, 1986, pág. 610; F. Palá Berdejo, *La disolución de sociedades y su revocabilidad*, 14 Rev. Der. Merc. 149, 176–179 (1952); L. Suárez-Llanos Gómez, "Sobre la separación de un socio de las sociedades de personas en Estudios de derecho mercantil en homenaje a Rodrigo Uría", Madrid, Ed. Civitas, 1978, págs. 793–794.

común, tomando en cuenta su aportación hacia la sociedad en general.

■ Visto un principio en contraposición con el otro, a juicio de Capilla Roncero, en la sociedad civil debe prevalecer el *intuitus personae*, el cual impediría la continuación de la sociedad si se producen alteraciones sustanciales que afecten a los socios. Albaladejo, *op. cit.*, 1986, págs. 610–611. Coincidimos con dicho criterio y, a tenor con todo lo anterior, estimamos que serían justos motivos para disolver una sociedad el incumplimiento con las obligaciones sociales por parte de alguno de los socios y la inhabilitación de un socio para los negocios sociales, concebidas estas causales según discutidas previamente.

■ Al evaluar si en una situación específica están presentes las circunstancias adecuadas para decretar la disolución de una sociedad, es imprescindible analizar si los hechos presentes en cada caso particular impiden o amenazan los fines para los cuales se constituyó la sociedad, afectando de esta manera el contrato en su esencia. En esa tarea compete a los tribunales examinar los motivos que fundamentan la reclamación, precisar la gravedad de la situación y ponderar rigurosamente las consecuencias de una disolución.

B. En la situación de autos, los doctores Jeanne Ubiñas, Víctor Marcial y José Tomé otorgaron en 1989 una escritura pública en la que formalizaron el acuerdo según el cual venían operando desde 1988. Formaron la sociedad especial Las Américas Radiation Oncology Center, S.E., de conformidad con el Suplemento P de la Ley de Contribuciones sobre Ingresos de 1954, entonces vigente. En el contrato estipularon que constituían la referida sociedad por un término de veinte (20) años. A tales efectos, en la Cláusula 5 de la Escritura de Ratificación y Constitución de Sociedad Especial hicieron constar lo siguiente:

The Partnership shall commence as of October 29, 1988 and shall continue until October 29, 2008, unless sooner terminated as hereinafter provided for, or unless extended for such longer term as may be determined by the election of partners entitle to more than 65% of the profits or losses of the Partnership. Escritura Núm. 5 de 29 de marzo de 1989, págs. 3–4.

Más adelante en el contrato se establecieron las causales y condiciones para la terminación de la sociedad. En específico se dispuso:

Notwithstanding anything to the contrary contained herein, the Partnership shall terminate upon any of the following events:
. a) A disposition of the Partnership of its entire interest in the property; or
b) A determination by the election of partners entitle to more than 75% of the profits or losses of the Partnership that the Partnership shall terminate. Cláusula 16, Escritura Núm. 5, *supra*, pág. 17.

El contrato de sociedad especial dispone, además, varios mecanismos para lidiar con situaciones tales como: la muerte e incapacidad de alguno de los socios, el retiro de un socio y la transferencia de todo o parte de su interés social. En lo referente a la separación voluntaria de alguno de los socios establece que, a menos que fuera substituido por otra persona aceptada por aquéllos con más del cincuenta (50) por ciento de las participaciones, ningún socio podría separarse voluntariamente de la sociedad. El contrato brinda, además, la alternativa a los socios, en su capacidad individual o a nombre de la sociedad, de elegir la adquisición de todo o parte de la participación social de aquel socio que desee "asignar, retirarse o transferir" todo o parte de su interés.

Los apelantes argumentan que, al acordar los socios que por decisión de aquéllos con el setenta y cinco (75) por ciento o más de las participaciones podrían disolver la sociedad especial, se excluyó cualquier otra causa de disolución, razonando que de esta manera se pactó la no aplicabilidad del Art. 1598 del Código Civil, *supra*.

■ A pesar de que el Código Civil guarda silencio con respecto a la cantidad de votos necesarios para proceder a una disolución, la doctrina acude a las reglas generales de la contratación y concluye que como regla general haría falta la unanimidad para disolver. Véanse, *e.g.*: Puig Brutau, *op. cit.*, pág. 519; F.N. Videla Escalada, *Las Sociedades Civiles*, 338 (1962). A tales efectos, el referido pacto entre las partes meramente excluye la regla general de que hace falta la unanimidad para disolver una sociedad establecida por un plazo determinado.

En cuanto a la facultad para pedir la disolución cuando concurra justo motivo para ello, encarnada en el referido Art. 1598 del Código Civil, al plantearse la cuestión de si puede renunciarse a ella, Scaevola no admite su renuncia de un modo general por razones de orden público. Scaevola, *op. cit.*, pág. 192. Sin embargo, sí presenta la posibilidad de renunciar a pedirla por ciertos motivos de carácter secundario. Íd.

■ En casos como el de autos, en que se haya acordado un término fijo de duración para la sociedad y las condiciones en que ésta se podría disolver antes de dicho término, el Art. 1598 del Código Civil, *supra*, aplicará por razones de equidad y de orden público. Este precepto del Código Civil encarna, junto a otros, uno de los principios rectores del derecho: la equidad. Véanse: *Don Quixote Hotel v. Tribunal Superior*, 100 D.P.R. 19, 28 (1971); *Agulló v. ASERCO*, 104 D.P.R. 244, 250 (1975). Como bien señala Puig Brutau, la obligación de someterse al plazo de duración convenido no puede ser inflexible ni rígida. Puig Brutau, *op. cit.*, pág. 518. Aun cuando estimamos, como Scaevola, que no puede renunciarse de forma general a la facultad para solicitar la disolución por justo motivo, sí podrían excluirse ciertas causas, de carácter secundario, como lo sería la inhabilitación física o mental de un socio, la incompatibilidad de cargos, etc.

En virtud de todo lo anterior, concluimos que el Art. 1598 del Código Civil, *supra*, aplica a todo tipo de sociedades civiles que se constituyen por un tiempo determinado.

En la situación de autos, las partes aceptan la existencia de serias desavenencias entre ellos, al punto de que han cortado toda comunicación entre ellos. Durante meses han tratado de negociar y llegar a un acuerdo de compra o venta de sus respectivas partes, sin llegar a término alguno. Tampoco han podido ponerse de acuerdo en cuanto al síndico liquidador que habría de nombrarse para la liquidación de la corporación.

Nos encontramos, por un lado, con que dos (2) de los socios, los doctores Tomé y Ubiñas, tienen el control necesario para hacer determinaciones, pues entre ambos poseen más de la mayoría de las participaciones. Del otro lado tenemos a un socio, el doctor Marcial, quien sostiene que ha perdido totalmente la confianza en sus socios tras la ocurrencia de serios incidentes con éstos. A tenor con lo expuesto anteriormente, el doctor Marcial debe tener una oportunidad de presentar en vista plenaria la evidencia necesaria para demostrar que existe un justo motivo para la disolución de la sociedad.

El rompimiento en las relaciones personales de los socios y en las otras dos (2) entidades no puede ser base per se para disolver esta sociedad especial en particular, y menos cuando los socios libremente pactaron quedar vinculados hasta una fecha en particular. Sin embargo, el alegado justo motivo debe apreciarse dentro del contexto del contrato social a que se refiere, el de la sociedad especial, en este caso, para así evaluar si están amenazados los fines para los cuales dicha sociedad se creó. En el caso de autos, el foro de instancia adjudicó la controversia sin el beneficio de una vista en la que las partes tuvieran una oportunidad de presentar la prueba correspondiente. Erró el foro de instancia el emitir su sentencia de forma sumaria. En este

caso procede la celebración de una vista evidenciaria en la que se ponga al tribunal a quo en posición de resolver si se da respecto a la sociedad especial el justo motivo que dispone el Art. 1598 del Código Civil, *supra*, para decretar su disolución.

Por entender que debe desfilar prueba particularmente relacionada con la sociedad especial para así dilucidar ciertas cuestiones de hecho necesarias para determinar si se da o no el justo motivo que dispone el citado Art. 1598 para disolver una sociedad establecida por un término fijo de duración, concluimos que el Tribunal de Circuito de Apelaciones erró al disolver la sociedad especial Las Américas Radiation Oncology Center, S.E. desde ese estrado apelativo.

Revocamos esa determinación y devolvemos el caso al tribunal de instancia para que, previa vista, determine si se da en este caso el justo motivo para decretar la disolución de la sociedad especial. Deberá demostrarse al tribunal que el motivo para dar por terminada la entidad es uno de los planteados en esta decisión y que el motivo que se aduce como justo no es imputable principalmente a culpa o dolo del demandante, ni se debe mayormente a un mero capricho suyo. De no existir justo motivo para dar por terminada una sociedad con un término fijo de duración, ella no podrá ser disuelta a menos que se den las causales estipuladas en el contrato. En ese caso, el tribunal debe tomar las medidas para asegurarse de que se protegen los derechos del socio no conforme.

## V

Los doctores Tomé y Ubiñas señalan, además, en su apelación que al ordenar la liquidación de la totalidad de los negocios entre las partes, el Tribunal de Circuito de Apelaciones erró al considerar asuntos y hacer determinaciones que no fueron objeto de la apelación, excediendo los

asuntos sometidos a su consideración e invadiendo la competencia del tribunal de instancia.

Durante los procedimientos seguidos en instancia, se decretó en primer lugar la disolución de la corporación mediante una sentencia parcial emitida el 10 de marzo de 1994.[14] De conformidad con el Art. XI del Certificado de In corporación,[15] se dispuso que la disolución sería efectiva a partir de 22 de marzo de 1994. Con posterioridad a la emisión de dicha sentencia surgieron serias discrepancias en cuanto a lo que implicaba el proceso de disolución social. Los doctores demandados entendían que la corporación debía seguir operando normalmente sin que incurriera en nuevas deudas. Marcial, por su parte, insistía en que se diera curso al proceso de liquidación de los activos para lo cual entendía que se debía poner fin a las operaciones.

Luego de recurrir en múltiples ocasiones al tribunal, éste se negó a convertirse en síndico liquidador de la corporación. Ordenó a las partes que sometieran sus candidatos a síndico para proceder a su nombramiento. En vista de las continuas disputas relacionadas a aspectos administrativos de la corporación, el tribunal decide que hasta tanto se nombrara a un síndico liquidador y éste asumiera su cargo, se mantendría el statu quo y la corpo-

---

[14] La sentencia parcial estipulaba que la disolución sería efectiva el 22 de marzo de 1994 y que durante el término contado a partir de la fecha de la vista celebrada [3 de marzo de 1994] hasta el 22 de marzo, las partes habrían de reanudar las negociaciones encaminadas a la compraventa de sus respectivas participaciones en todas o parte de las empresas, y que de culminar dichas gestiones en un acuerdo final quedaría sin efecto el decreto de disolución de Radiation Oncology Center, Inc. Se dispuso también que en el evento de que las partes no llegaran a un acuerdo para la compraventa de sus participaciones, se comenzarían los trámites de la liquidación de los activos de la corporación, los cuales deberían concluir dentro de un término que no excedería de seis meses, de conformidad con las disposiciones del Artículo XI del Certificado de Incorporación.

Las partes no pudieron ponerse de acuerdo para negociar la compraventa de sus respectivas participaciones dentro del término que les dio el tribunal. Por ende, el decreto de disolución tuvo efectividad a partir de 22 de marzo de 1994.

[15] "ARTÍCULO XI: Disolución

"Se comenzarán y llevarán a su fin dentro de un período razonable que no exceda de seis meses las transacciones y actos necesarios para liquidar los activos de la Corporación y disolverla al ruego del voto representativo de un Treinta por ciento o más de las acciones emitidas de la Corporación." Apéndice, pág. 586.

ración continuaría operaciones y facturando por los servicios médicos prestados. Véase la Resolución y Orden de 19 de octubre de 1994. Así las cosas, transcurrió un tiempo en lo que las partes presentaban sus candidatos y expresaban sus respectivos criterios al tribunal en torno a los candidatos sugeridos por la parte adversa. En el ínterin el tribunal emitió su segunda sentencia parcial, objeto del recurso de autos.

En su apelación al Tribunal de Circuito de Apelaciones, el doctor Marcial le planteó a ese tribunal el hecho de que aun cuando la corporación había sido disuelta, mediante Sentencia parcial de 22 de marzo de 1994, ésta seguía operando. Adujo que no existía base en derecho para la continuación de las operaciones corporativas, para que se le estuvieran imputando obligaciones contraídas de forma *ultra vires*, ni para que se obligara a las partes a rendirle servicios profesionales a la corporación.

El doctor Marcial presentó, además, al Tribunal de Circuito de Apelaciones una moción en torno a la renuncia del síndico liquidador, que más bien informa que el síndico seleccionado nunca aceptó el cargo. El apelante expresó que con el nombramiento del síndico liquidador esperaba que al fin se resolviese el estado de cosas que lo obligaba a permanecer en una "insostenible situación de indivisión forzosa" y lo sometía a una situación de servidumbre involuntaria con respecto a sus socios en dos (2) entidades legalmente disueltas. Solicitó a dicho foro que dictase una orden que prohibiera a las entidades disueltas seguir operando y que se le permitiera facturar de forma independiente (y no a través de la corporación disuelta) por los servicios rendidos por él. El Tribunal de Circuito de Apelaciones emitió a ésta un no ha lugar por considerar que dicho asunto debía ser sometido a la atención del Tribunal de Primera Instancia.

Posteriormente el Tribunal de Circuito de Apelaciones dictó su sentencia, en la que dispuso, en lo pertinente:

... [R]evocamos la sentencia apelada, y se ordena al Tribunal de Primera Instancia nombre un síndico liquidador en caso de que aún no lo ha[y]a hecho y que en el término de 30 días proceda con la liquidación de la totalidad de los negocios entre las partes. Con relación al planteamiento en torno a las obligaciones alegadamente *ultra vires* en las que incurrió la Corporación, se ordena al Tribunal apelado que refiera todos dichos asuntos al síndico liquidador para que haga las determinaciones y recomendaciones pertinentes. Se devuelve el caso .... (Escolio omitido.) Sentencia apelada, pág. 10.

En materia de disolución de corporaciones, la Ley General de Corporaciones vigente al momento de los hechos establecía que toda corporación que se extinguiera o que fuera disuelta, continuará como un cuerpo corporativo por un término de tres (3) años después de la extinción o disolución. Art. 1006 de la Ley Núm. 3 de 9 de enero de 1956 (14 L.P.R.A. sec. 2006).(¹⁶) Dicha extensión en la personalidad jurídica corporativa será limitada a unos propósitos particulares que estipula la propia ley. Éstos son llevar adelante los pleitos entablados por y contra la corporación; liquidar y terminar el negocio; deshacer los bienes y traspasarlos, y dividir las acciones de capital. Íd. No podrá continuar la personalidad jurídica a los efectos de continuar el negocio para el cual hubiese sido establecida la corporación. Íd.

Como se desprende de la anterior relación, la corporación del caso de marras se disolvió desde el 22 de marzo de 1994. De conformidad con nuestro ordenamiento corporativo, a partir de esa fecha no podía continuar el negocio que le servía de objeto. Sólo procedía encauzar su proceso de liquidación. Lo que implica el proceso de liquidación surge con claridad de la citada disposición de ley y del Art. XI del Certificado de Incorporación de Radiation Oncology Center, Inc.

---

(¹⁶) El 10 de agosto de 1995 la Asamblea Legislativa aprobó la Ley General de Corporaciones de 1995, Ley Núm. 144 de 10 de agosto de 1995 (14 L.P.R.A. sec. 3001 *et seq.*), la cual dejó prácticamente inalterado el Art. 9.08 (14 L.P.R.A. sec. 3008).

Del expediente ante nos no surge si el procedimiento de liquidación de la corporación está ventilándose mientras dilucidamos este recurso. Por ende, al igual que hizo el Tribunal de Circuito de Apelaciones, devolveremos al tribunal de instancia para que dicho foro nombre al síndico liquidador en caso de que no lo haya hecho y termine a la mayor brevedad posible con la liquidación de la corporación disuelta desde 1994.

## VI

Por los fundamentos antes expresados, *se revoca la sentencia emitida por el Tribunal de Circuito de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos relativos a la sociedad especial Las Américas Radiation Oncology Center, S.E. de conformidad con lo aquí expresado. Dicho foro debe, además, encauzar el proceso de liquidación de las otras dos (2) entidades, si todavía no lo ha hecho, para que a la mayor brevedad posible éstas sean liquidadas.*

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Corrada Del Río concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Negrón García se inhibió. El Juez Asociado Señor Rebollo López no intervino.